| |
|---|
| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY |
| **Caption in Compliance with D.N.J. LBR9004-1(b)** <br><br> **K&L GATES LLP** <br> David S. Catuogno, Esq. <br> One Newark Center, 10th Floor <br> Newark, New Jersey 07102 <br> (973) 848-4000 <br> david.catuogno@klgates.com <br><br> Counsel for New World Stainless LLC |

| | |
|---|---|
| In re: <br><br> NEW WORLD STAINLESS LLC, <br><br>                   Debtor. | Case No.:  21-17153 (KCF) <br><br> Chapter:  11 <br><br> Judge:     Hon. Kathryn C. Ferguson |

### MEMORANDUM OF LAW IN SUPPORT OF DEBTOR'S MOTION FOR AN ORDER ENFORCING THE AUTOMATIC STAY AS TO ITS TENANCY AT SUFFERANCE AND MAINTAINING DEBTOR'S OCCUPANCY OF PREMISES

### PRELIMINARY STATEMENT

Over the past two years, the world has been turned inside out by the COVID 19 pandemic. While pundits muse on the "new normal," it is not even remotely clear what that new normal may be. What is clear is that there are profound social and economic issues to be navigated and resolved in the aftermath of the pandemic and old rules and traditional analysis may not always apply. Court backlogs and sweeping Executive Orders have reset the playing field and complicated the path forward. Now, more than ever, Courts must eschew reflexive and formulaic resolution, and underlying issues must be viewed in their totality and through the lens of fundamental fairness, with resolutions hand-crafted to protect the interests of all parties and society as a whole.

This is one of those cases where there is tempest and distraction in the foreground, but a reasoned evaluation of the larger picture demands that the Debtor remain in possession of its Premises and allowed to continue operations. The Debtor herein is by no means suggesting that principles of law should be ignored or disregarded.  To the contrary, the Debtor submits that if the applicable laws are applied as they should be, consistent with the interests of justice and fundamental fairness, the viability of the Debtor will be preserved.  At the same time, the rights of everyone will be protected - including innocent non-parties.

At its essence, this matter involves a dispute between the Debtor and its Landlord.  Having said that, however, the Debtor is not here in Bankruptcy Court to re-litigate a landlord/tenant action.  That is, as will be set forth below, despite the fact that the New Jersey state court entered a Judgment of Possession prior to the bankruptcy filing, applicable law and the balance of the equities compel the maintenance of the status quo.  Specifically, the Debtor's should be allowed to continue in occupancy at the subject Premises, at least in the short-term, to protect the substantial interests of the estate and other affected parties.

While true that this bankruptcy case was precipitated by a landlord/tenant dispute, it is hardly a garden-variety dispute, and it is hardly a dispute that is susceptible to a cookie-cutter solution.  Given the relief being requested by the Debtor, it is necessary to provide come background on the underlying dispute.  Here, the Landlord alleges to be owed approximately $1.7 million in back rent.  The Debtor submits that the Landlord's rental claim is substantially overstated, containing, among other things, duplicative and excessive charges.  More significantly, however, the Debtor alleges that the Landlord breached the Lease first by, *inter alia*, failing to upgrade the electrical service at the property as required under the Lease (in addition to other breaches) and that the Debtor has been damaged in the amount of at least $3

million as a result of Landlord's breaches, which amount is far in excess of the Landlord's inflated rent claim. Indeed, at the summary trial in the state courts, the Landlord's predecessor testified that he was aware of the landlord's obligation to upgrade the electrical service at the site and was unable to do so. The successor Landlord took an assignment of the Lease and assumed all of the predecessor's obligations, including the electrical upgrade, an obligation with which it never complied. The original landlord certified that the cost of the electrical upgrade was priced into the monthly rent due under the Lease, even though the Landlord never provided the upgraded service.

The substantive disputes regarding the Lease are only the tip of the iceberg, as there are additional irregularities and distinctions that make this case most atypical. The Landlord here first initiated a landlord-tenant action in 2018. That action was settled between the parties. Thereafter, the Landlord initiated a second landlord-tenant action in 2019 - conspicuously failing to note the existence, or the settlement, of the 2018 action.[1] In any event, upon the Debtor's motion, the Court in the 2019 Action found that the issues between the parties were sufficiently complex that they could not be determined in a summary proceeding in Landlord/Tenant Court and therefore ordered that the matter be transferred to the Law Division.

When it became clear that the Landlord would not be able to obtain an immediate Judgement of Possession in the 2019 Action, it elected to re-open the settled 2018 action and pursue the eviction of the Debtor for violation of the settlement. Even though the Court had already ruled that the dispute between the parties should be adjudicated in the Law Division, and even though going back to the original 2018 action seemingly ran afoul of the entire controversy doctrine, the Court entered a Judgment of Possession in the 2018 Action. The Court denied,

---

[1] At that time, any action to dispossess was stayed Executive Order No 106 which established a moratorium on any eviction of the Debtor.

however, the Landlord's application for a Warrant for Removal.  The propriety of that Judgment

in the settled 2018 action is pending on appeal and a stay of execution has been entered.

In June 2021, the moratorium on commercial landlord/tenant trials was lifted and the

parties filed cross-motions against each other in the 2019 Action.  The Landlord sought entry of

a Judgment of Possession, the Debtor sought dismissal for lack of subject matter jurisdiction, on

the ground that the matter should have been transferred to the Law Division.  The Judge denied

the motion to dismiss, proceeded to try the case summarily, and entered a Judgment of Possession

and a Warrant of Removal.

The Debtor has appealed the Judgment of Possession and has requested a stay on the

execution of the Warrant for Removal pending the disposition of the appeal.  Notably, if the

appeal is successful, the Judgment of Possession will be unwound and the Debtor's rights under

the Lease, will be restored.

While the dispute with the Landlord has driven the filing of this bankruptcy case, this

matter is about much, much more than just a tenant/landlord dispute.  Here, the Debtor:

- employs approximately 35 individuals.

- owns equipment and inventory located at the premises worth several million dollars
and leases additional equipment, also located at the premises.

- has a backlog of $4 million worth of profitable work orders to be performed.

- has other creditors totaling several million dollars.

- possesses the liquidity to pay its employees, perform and service the backlogged work.

- has the liquidity to pay the Landlord for the post-petition use and occupancy of the
premises.

- has a pending appeal involving a potential affirmative claim against the Landlord of
approximately $3 million.

- has a pending appeal that, if successful, would vacate the Judgment of Possession and

restore whatever rights the Debtor continues to possess rights under the leasehold, including the potential right to renew through May 31, 2026.

Typically, a Judgement of a Possession terminates a lease and a terminated lease cannot be assumed in a subsequent bankruptcy case because it no longer exists.  The Debtor does not dispute that truism and is not, at this time, seeking any authority or permission to assume the Lease - albeit it may seek such authority if and when the Lease may be restored pursuant to the Appeal. The Debtor recognizes that the Bankruptcy Court does not have the power to resuscitate the Lease. Having said that, however, ***the state courts do have that power*** and there is a pending Appeal that seeks that very result.  As such, the Debtor should not be consigned to its doom while there is a viable Appeal pending.

As a practical matter, if the Debtor cannot get back into the Premises and resume operations, it will fail.  It will lose its employees.  It will lose its contracts. Its customers will lose the ability to procure necessary materials and several of those customer entities may fail as a consequence of NWS's failure to deliver necessary product. Hence, without continuing occupancy and continuing operations, everyone will lose. Moreover, if the Debtor is made to cease operations now, the Appeal, even if ultimately successful, would be mooted as the company would be defunct.  Accordingly, the Debtor seeks an Order from this Court maintaining its occupancy of the premises as a holdover tenant/tenant at sufferance pending a resolution of the Appeal. At the very least, the Debtor requests that it be allowed to occupy the Premises temporarily so that it can resume operations and generate revenue for the benefit of the estate while it pursues a relocation to an alternate location.

The Debtor's equipment and records are all at the Premises and therefore, as of the filing of the bankruptcy Petition, the Debtor is in occupancy of the Premises as a holdover tenant/tenant at sufferance.  The automatic stay provisions of the Bankruptcy Code prevent the Landlord from

interfering with the tenancy at sufferance and from exercising remedies over the property of the bankruptcy estate still located at the Premises.

The Debtor recognizes that it cannot stay at the premises for free as that would present a hardship on the Landlord.  The Debtor submits that it has sufficient liquidity and anticipated cash flow to pay market rent for the use and occupancy of the Premises in the post-petition period. Accordingly, the requested relief also benefits the Landlord.  That is, all the Landlord can hope for at this point is the ability to collect rent from a new tenant - a new tenant that does not yet exist.  Hence, if NWS is prevented from operating and is ultimately evicted, the Landlord would have to locate a new tenant, fit-up the Premises for the needs of the new tenant, and hope to start collecting rent - perhaps in six (6) to nine (9) months.  On the other hand, if the Debtor is allowed to maintain possession by Order of this Court, the Landlord will collect rent immediately.

Moreover, while the Debtor disputes that the Landlord has any viable economic claim, to the extent that it does, forcing an immediate cessation in the Debtor's operations would result in a liquidation that would produce pennies on the dollar for creditors - including the Landlord.  By preserving the Debtor's operations and viability, the Debtor's ability to reorganize would be preserved and it could generate far greater value for the benefit of creditors - by way of revenue derived from continued operations.

The Debtor is poised for breakout success.  As set forth below, there is a scarcity of raw material in the stainless steel fabrication industry, and while other manufacturers are struggling to obtain materials, the Debtor has raw material in stock and access to additional raw materials going forward.  The Debtor also uses proprietary processes for custom work that cannot be performed by any other manufacturer(s).  There is presently an abundance of backlogged profitable work to keep the Debtor busy in the short term, and additional customers continue to

seek out the Debtor's services going forward.

Against the backdrop of those possibilities, there is the Landlord.  One single creditor with a Judgment of Possession that is currently under appeal. One single creditor who seeks to dispossess the Debtor and whose best-case scenario is an ability to re-let the Premises to someone else and start collecting rent several months down the road.

On the other hand, if the Debtor is forced to shut down, there are approximately thirty-five (35) employees who will be out of work and approximately thirty-five (35) families who will have to endure that hardship during a pandemic and, not to mention, in the wake of unprecedented destructive flooding and rain damage in the residential area surrounding the Premises.  There are also numerous other legitimate creditors who will get nothing if the Debtor ceases operations. There are principals who have invested their blood, sweat and treasure into a company who will lose everything if NWS shuts down.  All of these parties are now in peril because of a most unusual judgement entered in summary proceedings amidst numerous procedural irregularities in an overburdened state court system feeling its way back to normalcy in the aftermath of a global pandemic.

This Court has the ability and authority to stave off that harsh and unnecessary result while at the same time protecting the rights of the Landlord and other innocent parties.  The language and intent of the Bankruptcy Code and the clear weight of the equities compel a resolution that will maintain the Debtor's occupancy as a tenant at sufferance of the Premises and resume operations, at least temporarily, while the Appeal progresses further and/or the Debtor locates a suitable replacement location.

## STATEMENT OF FACTS

### *The Landlord/Tenant Litigation*

Landlord Ivy 100 Rand Property LLC ("Ivy Rand" or the "Landlord") is the successor landlord on a lease of real property dated February 1, 2009 (the "Lease") with New World Stainless (the "Debtor" or "NWS") for premises located at 100 Randolph Road, Somerset, New Jersey 08873 (the "Premises"). [2]  Ivy Rand is a successor landlord in this complex commercial dispute, having taken an assignment of the Lease, with all of its rights and obligations, in March 2019. In 2018, Ivy Rand's predecessor initiated a summary action for possession concerning rent allegedly owed under the parties' lease (the "2018 Action").

On about October 4, 2019, Ivy Rand filed another summary action for possession of the premises (the "2019 Action"). The Complaint in the action did not reference or seek relief relative to the 2018 action or the settlement thereof.[3] NWS responded to the Complaint in the 2019 Action by filing a motion to transfer the matter to the Law Division, supported by a proposed Verified Counterclaim for damages arising from the numerous and longstanding breaches of the Landlord and its predecessors relative to their obligation to maintain and improve the Premises.  The damages asserted in the Counterclaim were in excess of the rent asserted to be due in the 2019 Action.

The Trial Court agreed that the case was sufficiently complex that it should be transferred

---

[2]  Unless otherwise noted, factual support for the statements contained in this motion is contained in the Certification of J. Cameron Zielinske (the "Zielinske Cert.") which has been filed along with this Motion.

[3]  Notably, in the complaint by Landlord in the 2019 summary eviction action, counsel included the necessary *R.* 4:5-1 certification that "the matter in controversy is not the subject of any other action or arbitration proceeding, now or contemplated, other than an action to collect the damages referred to in this complaint, and that no other parties should be joined to this action." In addition, the Landlord included a "Landlord's Verification" complaint that provided, in relevant part, "I certify that,… the matter in controversy is not the subject of any other court action or arbitration proceeding now pending or contemplated other than a future action to collect the unpaid rent that forms the basis for the eviction proceeding being initiated herein."

to the Law Division, but conditioned the transfer upon NWS escrowing $303,118 in rent allegedly owed which was the amount asserted to be due by the Landlord without any offset for the damages claimed by NWS.  NWS filed a Motion for Reconsideration, which the Trial Court denied on March 20, 2020.  The Debtor sought an interlocutory appeal of the escrow requirements, which the New Jersey Appellate Division denied without prejudice because the requirement was not a final judgment.

Landlord attempted to initiate another action in Bergen County, seeking to enforce its rent claims, but was rebuffed on the basis, among other grounds, of the entire controversy doctrine. Landlord subsequently moved before the same Trial Judge in Somerset County for a judgment of possession in connection with the summary action that the parties had settled in May 2018.  The Trial Court granted Landlord's motion on July 21, 2020.   During oral argument, Counsel for Plaintiff acknowledged that the settlement agreement in this action was not part of the record of the "companion case" [that is, the 2019 Action for summary eviction].   Counsel further acknowledged that he had filed the motion under the 2018 Action because the coronavirus pandemic had delayed action in the 2019 Action.  Moreover, during the summary trial of the 2019 Action, Landlord's predecessor testified that he was aware of his obligation to upgrade the electrical service at the site and admitted that it had not been fulfilled.

In motion practice before the summary trial of the 2019 Action, the Landlord sought a ruling that NWS was a trespasser and, therefore, the Landlord was entitled to a Judgment of Possession.  The trial judge denied the Landlord's Motion by way of Order dated May 18 2021, which Order specifically stated that "the court agrees with defendant that it is not/will not be a trespasser; it is and will be a tenant at sufferance." *See* Zielinskie Cert., Exhibit A.  The judge then set the matter down for a summary trial on July 28, 2021, later adjourned to August 12, 2021.

At the August 12 summary trial, the Landlord sought a Judgment of Possession based solely on the expiration of the Lease on May 31, 2021.  Landlord also voluntarily dismissed its claims for failure to pay rent.  NWS presented evidence at the summary trial that there was an option to renew the Lease through May 31, 2026 and that -- because the parties were in litigation on May 31, 2020, the date for providing notice of intent to renew under the Lease -- exercising that option would have been rejected by the Landlord and, therefore, would have been futile and not required under New Jersey law.  The Landlord conceded on the record that it would have rejected any such exercise.  The trial court found, as matters of fact, that (1) the Lease contained an option to renew through May 31, 2026; (2) that the Landlord had an obligation to upgrade the electrical service but had failed to do so; and (3) that NWS had failed to exercise the option to renew.  The trial court failed to address NWS's futility argument.  The court entered a Judgment of Possession and a Warrant of Removal.  That Judgment and Warrant are on appeal.

### *The NWS Precision Manufacturing Process*

While NWS concedes that this Court is not the proper forum to re-litigate the status of the Lease and the propriety of the summary eviction process, it submits that some of the background of this matter may be helpful to this Court in its consideration of the requested relief.

NWS is a manufacturer of precision welded stainless steel pressure tubing used for, among other things, medical devices and surgical equipment, aerospace components, automotive parts, chemical injection and hydraulic control lines in the Oil/Gas industry, heat transfer products for industrial refrigeration and many other applications requiring strong, flexible, non-corrosive, high-pressure stainless steel, nickel alloy and titanium tubes manufactured to exacting tolerances.

NWS's manufacturing process is deeply sophisticated, highly automated, and relies upon the proper and continuous operation of complex, precisely calibrated, and sensitive computerized

10

machines involving, inter alia, subjecting the tubes to temperatures of approximately 2,000 degrees Fahrenheit, followed by precisely timed and regulated cooling. Final sequences run the tubes through a part of the mill that utilizes sophisticated non-destructive inspection equipment to analyze the product, outside and inside, for the tiniest of imperfections.

All of these processes require a continuous, sufficient, and reliable source of electricity. Fluctuations in voltage or amperage during operation causes a host of problems, including damage to product during fabrication and the tripping of breakers that shuts the equipment down and halts production. Continuous low voltage forces NWS to operate the cooling tower fans at a reduced rate, resulting in lost efficiency via less cooling capacity. Extreme fluctuations can physically damage the mills' computerized control equipment.

Prior to the execution of the Lease, the original landlord and NWS acknowledged and agreed that the power supply to the Premises was wholly inadequate, which deficiency not only inhibited NWS's growth and installation of new equipment, but also caused periodic and significant voltage drops and brownouts that would halt production, damage the product in process, and damage NWS's precision machinery. For these reasons, the Lease provided for the installation of upgraded electrical service by the Landlord at its own expense. There is no dispute that neither Ivy Rand nor its predecessor(s) ever complied with this obligation under the Lease, nor is there any dispute that Ivy Rand assumed this unfulfilled obligation when it took an assignment of the Lease.

NWS has experienced an elevated frequency of electrical supply irregularities, which resulted results in lost revenues and increased costs. The voltage fluctuations and irregularities have occasionally caused physical damage to NWS's sensitive electronic systems. The resulting downtime causes a loss of revenue, an increase in facility and production costs, extended

11

production times, delays in deliveries, and dissatisfied customers.    Significant equipment failures due to electrical anomalies have been realized.    These occurrences typically involve more than one full day of downtime, and on average take one and a half days to remedy.

In addition to the foregoing, the inadequate power supply also compromises NWS's ability to cool the product during the fabrication process and results in a slower production speeds. This delay accumulates and causes a reduction in saleable tubing and a concomitant reduction in revenue.    Additionally, the Lease required the Premises to be metered with a separate and unique utility meter to measure the electricity actually used.    Not only was this requirement not satisfied, the sub-meter located on site has been inoperable for extended periods of time and the Landlord has at times charged NWS various flat fee/round number amounts for electrical service in a given month without providing any support or foundation.    Finally, the mechanical Load Levelers at three of the four loading bays at the Premises have been dysfunctional for a significant portion of the decade long NWS tenancy.    As a result, NWS has been forced to run all of its incoming and outgoing shipment through one single loading bay while three additional bays lay fallow.    This limitation in capacity has caused further delay and, of course, further reduction in revenue and other damages to NWS.

### The Collateral Impact of a Cessation of Operations.

As noted, *supra*, if the Debtor is not permitted to maintain its occupancy at the Premises as holdover tenant/tenant at sufferance and continue to operate, it likely cannot survive beyond the week.    The obvious and immediate impact is that all thirty-five (35) of the Debtor's employees will be out of work and that all of these families will endure the loss of livelihood and benefits in these most uncertain and harrowing times.    Other legitimate creditors, totaling in excess of $6 million, will lose their ongoing payment stream and be relegated to a speculative recovery of

pennies on the dollars and fighting over the scraps of a defunct company in liquidation.  The

principals of the Debtor will lose their entire investment and their life's work in creating and

nurturing a cutting-edge company that is viable and profitable - solely because of a two-party

dispute with a landlord that is yet to be resolved with finality.

Those impacts, significant as they are, are not the only consequence of a shut down.  The

Debtor has numerous critical customers who are dependent on NWS's delivery of product that is

in process or on order, and whose continued viability is dependent on NWS's ability to fulfill

current orders.  Specifically:

1) NWS supplies an integral component for the upstream Oil & Gas industry, being one of only two primary producers supplying a certain type of chemical injection line required for oil extraction. NWS is a supplier to the major oilfield service (OFS) providers.  Cessation of NWS operations will directly and negatively impact the domestic production of hydrocarbons.  There is not enough production capacity or raw material available to fill the potential void resulting from the loss of NWS supply.

2) One industry leading OEM in the industrial refrigeration industry utilizes NWS as a ***sole*** supplier for an internally enhanced tubular product.  NWS is the ***only*** tubing producer capable of manufacturing the specialty tubing.  The cooling equipment, installed in refrigerated warehouses and supermarket cooling systems, employs ammonia (a green natural product) instead of synthetic refrigerants, which synthetics account for 1/3 of greenhouse gas emissions.  The abrupt cessation of NWS operations would not only have a catastrophic and negative impact on this customer that currently employs NWS as its sole supplier, it would also result in the end of this product line, and the end of a potential game-changing mass market product in the quest for greener industrial processes. NWS submits that public policy strongly militates in favor of the preservation of NWS operations and the preservation of this ecologically responsible product line.

3) Major suppliers of brake lines to the automotive industry use NWS as a primary supplier. These critical customers rely on a continual supply of NWS tubing to support the production of new automobiles.  Cessation of NWS operations will directly and negatively impact the domestic production of automobiles.

There are numerous other critical customers operating in myriad industries that rely on a steady

supply of NWS tubing.

Additionally, of particular importance are the current market constraints limiting the supply

of stainless steel.  Material is simply not available, and lead times are prohibitively long or absent

all together.  Many producers have limited production or have temporarily closed due to the unprecedented market conditions.  NWS has, however, through proactive actions, secured a continual supply of material and has been able to rescue many customers that have lost suppliers. This dynamic has presented new revenue opportunities that NWS can exploit.

Conversely, if NWS is not there to pick up this slack, there are no ready replacements to fill the potential loss of the NWS supply, both in terms of production capacity and available materials.  If NWS ceases production, these critical customers will not be able to procure the product necessary for them to provide their services to the public at large - or at the very least will be severely delayed and compromised by seeking an alternate supplier and taking a substantially delayed place in a new queue.  Some of these entities could themselves suffer catastrophic damage to their ability to function including, but not limited to being forced to shut down themselves. Moreover, the public will be damage by an inability to obtain these services.

NWS has machinery, inventory and raw materials with a value of several million dollars located at the Premises. NWS has booked orders for future work to be performed, which orders are projected to produce in excess of $4 million in revenue.  NWS is viable and ready, willing and able to get to work.

For these reasons, in addition to the other compelling reasons set forth above, the Debtor requests that it be permitted to maintain its occupancy of the Premises post-petition - in exchange for adequate protection payments to the Landlord as determined by this Court - during the pendency of the appeal or at least for a sufficient period of time for the Debtor to locate a suitable alternate location.

## Legal Argument

## I.    NWS's Tenancy at Sufferance is Entitled to Protection Under the Automatic Stay.

Subsection 362(a)(3) of the Bankruptcy Code (the "Code") "provides that, except as set forth in subsection (b), the filing of a bankruptcy petition operates as a stay of '[a]ny act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.'" *See In re St. Clair*, 251 B.R. 660, 664 (D.N.J. 2000), *aff'd sub nom. St. Clair v. Wood*, 281 F.3d 224 (3d Cir. 2001) (quoting 11 U.S.C. § 362(a)(3)). Therefore, subsection 362(a)(3) stays any act seeking to: "(1) obtain possession of, or exercise control over property of the estate (that is, property of the debtor as of the date of the filing of the petition), or (2) obtain possession of property from the estate (property over which the estate has control or possession)." *Id.* (citing 11 U.S.C. 362(a)(3)). "The scope of the automatic stay is undeniably broad." *In re Atl. Bus. & Cmty. Corp.*, 901 F.2d 325, 327 (3d Cir. 1990).

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. . . . The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally.

H.R.Rep. No. 595, 95th Cong., 2d Sess. 340 (1977), *reprinted in* 1978 U.S. Code Cong. & Admin. News 6296.

Section 541 of the Code defines the term "property of the estate" which is comprised of ". . . all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). It is well settled that the intended scope of this section is broad. *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 (1998). Such "includes all kinds of property, . . .

tangible or intangible. . . ." *See* H.R. Rep. 595, 95th Cong., 1st Sess. 367 (1977), *reprinted in* 1978

U.S. Code Cong. & Admin. News 5787, 6323.

Among these interests, "a debtor's possession of a tenancy at sufferance creates a property

interest as defined under Section 541, and is protected by Section 362 of the Bankruptcy Code.

The language of Section 362 makes clear that mere possession of property at the time of filing is

sufficient to invoke the protections of the automatic stay." *See In re Atl. Bus. & Cmty. Corp.*, 901

F.2d 325, 328 (3d Cir. 1990); *see also In re Convenient Food Mart No. 144, Inc.*, 968 F.2d 592,

594 (6th Cir. 1992) (stating, "We join other circuits in holding that a tenancy at sufferance is a

possessory interest in real property within the scope of the state in bankruptcy under section 541.");

*but see In re Truoung*, 557 B.R. 326, (Bankr. D.N.J. 2016) (determining that a Chapter 7 debtor's

bare possessory interest as a holdover tenant under a month-to-month commercial lease was not

included in property of the estate or protected by the automatic stay).   "Indeed, a mere possessory

interest in real property, without any accompanying legal interest, is sufficient to trigger the

protection of the automatic stay." *In re 48th Street Steakhouse, Inc.*, 835 F.2d 427, 430 (2d Cir.

1987).

The term "possession" within Section 362 was intended to require that the estate "have a

good-faith, colorable claim to possession." *St. Clair*, 251 B.R. at 666. Moreover, an equitable

interest in property may constitute possession. *Id.* at 668; *see e.g., In re Atl. Bus. & Cmty. Corp.*,

901 F.2d 325, 328 (3d Cir. 1990) (holding that the debtor was effectively in possession of the radio

station by operating its business and therefore had an interest in property protected by 362(a)(3));

*cf. Barel v. Fed. Nat'l Mortg. Assoc.*, No. 3:19-CV-16054 (PGS), 2021 WL 1196207, at *3 (D.N.J.

Mar. 30, 2021) (holding that the debtor did not have a "good faith colorful claim to possession"

since the deed to the property had been transferred six months prior to filing).

Under New Jersey law, a tenant at sufferance or a holdover tenant "'is one who comes into possession of land by lawful title, usually by virtue of a lease for a definite period, and after the expiration of the period of the lease, holds over without any fresh leave from the owner.'" *Mintz v. Metro Life Ins. Co.*, 153 N.J. Super 329, 333 (Morris Cnty. Ct. 1977) (quoting *Standard Realty Co. v. Gates*, 99 N.J. Eq. 271, 275 (Ch. 1926)).

In the present matter, the Superior Court has acknowledged and agreed with the Debtor that upon the termination of the lease, the Debtor "will not be a trespasser; it is and will be a tenant at sufferance." [May 18, 2021 Order].

As noted by the Third Circuit in *In re Atl. Bus. & Cmty. Corp.*, "a debtor's possession of a tenancy at sufferance creates a property interest" under Section 541 and is protected under Section 362 of the Code. *See In re Atl. Bus. & Cmty. Corp.*, 901 F.3d at 328. This protection applies directly to the Debtor which has retained a "good-faith, colorable claim to possession" since prior to the filing of the Bankruptcy Petition. Similar to *In re Atl. Bus. & Cmty. Corp.*, the Debtor has been effectively in possession of the Property and was operating in the ordinary course.

Additionally, there are millions of dollars of Debtor equipment and inventory at the Premises, not to mention virtually all of the Debtor's business and financial records. The Landlord has absolutely no interest in the Debtor's equipment and inventory and such equipment and inventory is protected from any enforcement action under the automatic stay. As long as the Debtor's equipment, inventory and records are at the Premises, the Debtor has a substantial presence at the site and an equitable interest in continued occupancy site so as to access its assets and records, and utilize same in connection with its efforts to reorganize. Indeed, without access to its books and records, the Debtor will be unable to perform its obligations as a debtor-in-

possession and unable to otherwise meaningfully pursue a reorganization. Therefore, its continued equitable interest in occupancy is absolutely vital to the administration of this case

Contrary to *Truoung*, this case is not limited to and defined by a bare possessory interest and nothing else. Here, the Debtor's possessory interest is protected by the Debtor's pending Appeal which, if successful, will negate the Judgment of Possession and restore the Debtor's rights under the Lease, whatever they may be. Additionally, in this case, we have a specific finding of the state court that NWS is a tenant at sufferance and not trespassing. Thus, there is a state court finding of a protectable occupancy interest.

This case also has been complicated, and perhaps tainted, by the administrative difficulties of the state courts emerging from the COVID 19 pandemic and the various Executive Orders and interim protocols that were put in place to account for the pandemic related issues. Indeed, unlike *Truoung*, this case involves a most atypical underlying summary proceeding conducted (i) contrary to a prior Court Order finding that the dispute was a complex matter unfit for summary disposition; and (ii) in a case related to an almost identical companion case where a different disposition had been reached, and in a manner that was potentially violative of the absolute priority rule. Until such time as the Appellate Division renders a decision regarding the validity of the Judgment of Possession, the Debtor's possessory interest as a tenant at sufferance and equitable interest in continued occupancy has not lapsed.

Another crucial distinction is that the Debtor herein seeks the reorganization of its business as opposed to the Chapter 7 liquidation sought by the debtor in *Truoung*. The reorganization here is centered upon the Debtor's Appeal which will restore whatever rights NWS has under the Lease, including the potential extension of the Lease term until May 31, 2026, and potentially result in a further economic recovery that could be utilized as part of the reorganization plan. Additionally,

inherent in NWS's reorganization efforts is the continued operation and viability of the Debtor

entity and the public policies that will be advanced by such reorganization including, but not

limited to, the preservation of jobs and the continued production and installation of crucial

infrastructure materials in critical industries during the pandemic economy.  Not to mention that

continued operations means continued revenue that could be used to pay creditors and to otherwise

further the Debtor's reorganization.

Thus, the Debtor maintains an equitable possessory interest that is further protected through

its current pending Appeal. This equitable property interest constitutes property under Section 541

of the Code and is therefore entitled to protection pursuant to Section 362 of the Code.

## II.     The Circumstances of this Matter Dictate that that Bankruptcy Court Utilize its Equitable Power to Maintain the Debtor's Occupancy of the Premises.

Section 105(a) of the Code expressly grants bankruptcy courts equitable power to "issue

any order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title." 11 U.S.C. § 105(a). "Bankruptcy courts are 'courts of equity, empowered to invoke equitable

principles to achieve fairness and justice in the reorganization process.'" *In re Combustion Eng'g,

Inc.*, 391 F.3d 190, 235 (3d Cir. 2004) (quoting *In re Aquatic Dev. Group, Inc.*, 352 F.3d 671, 680-

81 (2d Cir. 2003); *see also Local Loan Co. v. Hunt*, 292 U.S. 230, 240 (1934) ("[C]ourts of

bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in

equity."). Among the equitable powers, bankruptcy courts may "craft flexible remedies that, while

not expressly authorized by the Code, effect the result the Code was designed to obtain." *Official

Comm. Of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330

F.3d 548, 568 (3d Cir. 2003) (*en banc*).

Bankruptcy courts, as courts of equity, "have broad authority to modify creditor-debtor

relationships." *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990). Likewise, section

105(a) "enables courts to issue orders necessary to protect estate property subject to bankruptcy proceedings." *In re Krause*, 414 B.R. 243, 263-64 (Bankr. S.D. Oh. 2009).

Here, the company is viable.  There are employees.  There is inventory.  There is work in process and there is backlogged work to be done in the future.  There is also a measure of liquidity.  NWS can immediately pay rent for the remainder of the month of September and pay going forward rent at the fair rental value as determined by the Court.  There is no prejudice to Ivy Rand as it will be paid for as long as the Debtor is occupying the Premises during the post-petition period.

Even if the tenancy at sufferance is short term until the Debtor can relocate, that will serve the critically important goal of keeping the Debtor alive and viable and, all the while, Ivy Rand will still be paid and protected.  If, on the other hand, the Debtor is not allowed to maintain its occupancy of the Premises and resume operations promptly, its collapse and failure would be inevitable, imminent and irrevocable. NWS likely would be permanently out of business within a week.  If that were to happen, the employees lose, the third-party creditors lose, the equity holders lose and the critical customers lose, and various aspects of the infrastructure economy lose.

There is even a substantial argument that the Landlord loses.  That is, upon NWS's failure, the Landlord would have a vacant, non-revenue producing property for the next several months or more.  Conversely, if this Court authorizes NWS to maintain occupancy contingent on the payment of post-petition use and occupancy, Ivy Rand will have an immediate and substantial income stream.  Additionally, if the Landlord's back rent claim has any viability at all, there will be a surviving reorganized entity to pay such claim, rather than the carcass of a defunct and assetless entity.

## CONCLUSION

For the foregoing reasons, Debtor NWS submits that its occupancy of the Premises should be maintained post-petition for such period of time as authorized by this Court subject to the payment of post-petition use and occupancy charges at a rate determined by this Court.

Dated: September  10 , 2021
      Newark, New Jersey

**K&L GATES LLP**

By: */s/ David S. Catuogno*
David S. Catuogno, Esq.
One Newark Center, 10th Floor
Newark, New Jersey 07102
Tel: (973) 848-4000
Fax: (973) 848-4001
Email: david.catuogno@klgates.com

Counsel for New World Stainless
LLC